UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FREDERICK KAPLAN,

                              Plaintiff,

        v.

COUNTY OF ORANGE, *et al.*,

                              Defendants.

No. 20-CV-1382 (KMK)

OPINION & ORDER

<u>Appearances:</u>

Eugene M. Bellin, Esq.
New York, NY
*Counsel for Plaintiff*

Richard A. Ashman, Esq.
Michelstein & Ashman, PLLC
New York, NY
*Counsel for Plaintiff*

Harold L. Moroknek, Esq.
Marshall, Dennehey, Warner, Coleman and Goggin
Rye Brook, NY
*Counsel for Defendants Town of Warwick, Alton S. Morley, Frederick M. Hoffman, Shawn Tetzlaff, and Thomas E. Maslanka*

Nadia E. Niazi, Esq.
Finkelstein Blankinship Frei-Pearson & Garber LLP
White Plains, NY
*Counsel for Defendants Town of Warwick, Alton S. Morley, Frederick M. Hoffman, Shawn Tetzlaff, and Thomas E. Maslanka*

Louis U. Gasparini, Esq.
Schwab & Gasparini, PLLC
White Plains, NY
*Counsel for Defendants Access: Supports for Living Inc., Laura Altieri, and Jane Doe*

KENNETH M. KARAS, United States District Judge:

Frederick Kaplan ("Plaintiff") brings this Action under 42 U.S.C. § 1983 and state law against the County of Orange (the "County"), Darcie M. Miller ("Miller"), Access: Supports for Living Inc. ("Access Inc."), Laura Altieri ("Altieri"), Jane Doe ("Doe"), the Town of Warwick (the "Town"), Alton S. Morley ("Morley"), Frederick M. Hoffman ("Hoffman"), Shawn Tetzlaff ("Tetzlaff"), and Thomas E. Maslanka ("Maslanka" and, collectively, "Defendants").  Before the Court are two Motions To Dismiss Plaintiff's Complaint, one on behalf of Access Inc., Altieri, and Doe (the "Access Defendants"), (*see* Dkt. No. 37), and one on behalf of Morley, Hoffman, Tetzlaff, Maslanka, and the Town (the "Town Defendants"), (*see* Dkt. No. 39).  For the following reasons, Access Defendants' Motion is granted, and Town Defendants' Motion is denied.

## I.  Background

### A.  Factual Background

The following facts are drawn from Plaintiff's Complaint and are taken as true for the purposes of resolving the instant Motions.

This case revolves around an incident that took place on March 13, 2019, when police forcibly removed Plaintiff from his home and took him to a local hospital, where he was detained out of concern for his mental health.  (*See* Compl. ¶¶ 2, 41–42, 52–59 (Dkt. No. 1).)  Plaintiff alleges that his removal and detention were based on false information provided by an employee of Access Inc., a private organization working in conjunction with the County.  (*See id.* ¶ 41.)  The Court will outline the relationship between Access Inc. and the County before summarizing the events of March 13.

### 1.  Access Inc.'s Mobile Mental Health Team

At some point prior to the events in question, the County entered into an agreement with Access Inc., a corporation organized under New York law.  (*Id.* ¶¶ 10, 13.)  The purpose of this agreement was for Access Inc. "to perform certain services on behalf of" the County's Department of Mental Health.  (*Id.* ¶ 13.)  Pursuant to this agreement, the County authorized Access Inc. to operate a "Mobile Mental Health Team" that would assess "persons possibly in need of immediate hospitalization due to mental disease or defect."  (*Id.* ¶ 15.)  Plaintiff alleges that the County "delegated responsibility" for making such determinations to Access Inc. and Altieri, who served as the assistant director of the Mobile Mental Health Team operated by Access Inc.  (*Id.* ¶¶ 17–18.)

### 2.  Plaintiff's Removal and Detention

Plaintiff alleges that on March 13, 2019, Altieri "falsely informed" Miller, the Commissioner of the County's Department of Mental Health, that Plaintiff "was exhibiting behavior indicating that he was in immediate need of care and treatment for a mental illness which was likely to result in serious harm to himself or to others."  (*Id.* ¶¶ 8, 41.)  Pursuant to § 9.45 of the New York Mental Hygiene Law ("MHL"), Miller issued an "Authorization for Custody/Transportation of a Person Alleged to be Mentally Ill" (the "Removal Order").  (*Id.* ¶ 42.)  The Removal Order identified Altieri as the source of information regarding Plaintiff's behavior.  (*Id.* ¶ 43.)  Although the Removal Order also identified Altieri "as a licensed psychologist, registered professional nurse[,] or certified [s]ocial [w]orker currently responsible for providing treatment services to [P]laintiff," (*id.* ¶ 44), Plaintiff alleges that Altieri "never provided treatment services" to him, and thus, the representation contained in the Removal Order was false, (*id.* ¶¶ 45–46).

3

On March 13, after Miller issued the Removal Order, Altieri delivered it to the Town of Warwick Police Department (the "Town Police"). (*Id.* ¶ 49.) Plaintiff alleges that Miller, along with Altieri and an unidentified employee of Access Inc. ("Jane Doe"), (*id.* ¶ 23), asked the Town Police to arrest Plaintiff, (*id.* ¶ 50). Plaintiff further alleges that Altieri "importuned" Morley, Hoffman, Tetzlaff, and Maslanka (the "Individual Town Defendants")—each of whom served as police officers for the Town Police, (*see id.* ¶¶ 27, 29, 31, 33)—"to seize and arrest" Plaintiff and transport him to Orange Regional Medical Center ("Orange Regional"), (*id.* ¶ 51).

On the same day, Altieri, Doe, and Individual Town Defendants entered Plaintiff's property and forcibly entered his residence. (*Id.* ¶¶ 52–53.) Individual Town Defendants allegedly forced Plaintiff to the ground, sat on his back to prevent him from standing, and then handcuffed and arrested him. (*Id.* ¶¶ 54–56, 58.) Plaintiff alleges, without elaboration, that Altieri and Doe also "participated" in his seizure and arrest. (*Id.* ¶ 57.) Plaintiff emphasizes that none of these Defendants had a "valid warrant issued by a disinterested judicial officer authorizing [his] arrest." (*Id.* ¶ 60.) After Plaintiff had been arrested, Morley and Tetzlaff transported him to Orange Regional, (*id.* ¶ 59), where Altieri "importuned" physicians "to detain [him] . . . indefinitely," allegedly "despite [a] lack of probable cause to believe that he was a danger to himself or to others," (*id.* ¶ 61). Plaintiff was involuntarily held at Orange Regional for approximately six hours before being released. (*Id.* ¶¶ 59, 62.)

B.  Procedural History

Plaintiff filed his Complaint on February 18, 2020. (*See* Dkt. No. 1.) Miller and the County ("County Defendants") filed an Answer on March 23, 2020. (*See* Dkt. No. 20.) After receiving an extension of time to respond to the Complaint, (*see* Dkt. No. 15), Altieri and Access Inc. filed a pre-motion letter regarding their proposed motion to dismiss on April 13, 2020, (*see*

Dkt. No. 21).  Plaintiff responded on April 20, 2020.  (*See* Dkt. No. 26.)  Meanwhile, on April 17, 2020, the Court granted Town Defendants' request for an extension of time to respond to the Complaint, (*see* Dkt. No. 25), and, on May 19, 2020, Town Defendants filed a pre-motion letter regarding their proposed motion to dismiss, (*see* Dkt. No. 30).  Plaintiff responded on May 26, 2020.  (*See* Dkt. No. 32.)

The Court held a pre-motion conference on June 3, 2020 and adopted a briefing schedule for Defendants' respective motions.  (*See* Dkt. No. 36; Dkt. (minute entry for June 3, 2020).)  Access Defendants filed their Motion To Dismiss and supporting papers on July 8, 2020, (*see* Dkt. Nos. 37–38), and Town Defendants filed same on July 10, 2020, (*see* Dkt. Nos. 39–40).  Plaintiff filed his Opposition on August 31, 2020.  (*See* Dkt. Nos. 41–43.)  Town Defendants filed their Reply on September 24, 2020, (*see* Dkt. No. 46), and Access Defendants filed their Reply on September 30, 2020, (*see* Dkt. No. 47).  On December 1, 2020, Access Defendants filed a letter notifying the Court of recent supplemental authority from the Northern District of New York, (*see* Dkt. No. 48), and Plaintiff responded on December 2, 2020, (*see* Dkt. No. 49).

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the 'grounds' of his [or her] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions

devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*,

199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted); *see also Wang v. Palmisano*, 157 F.

Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

B.  Analysis

Plaintiff has brought § 1983 claims for unreasonable search and seizure (Count Two) and

false imprisonment (Count Three) against Altieri, Doe, and Individual Town Defendants.

(Compl. ¶¶ 75–92.)  Plaintiff has also brought a § 1983 claim for excessive force (Count Four)

against Individual Town Defendants, (*id.* ¶¶ 93–101), and a claim for failure to intervene (Count

Five) against Altieri and Doe, (*id.* ¶¶ 102–07.  The Court need not consider Plaintiff's § 1983

claim for false imprisonment against Miller, (*id.* ¶¶ 63–74), who has not moved to dismiss this

claim.  Plaintiff has also asserted state law claims for trespass (Count Six) and False

Imprisonment (Count Nine) against Access Defendants and Town Defendants.  (*See id.* ¶¶ 108–

12, 121–25.)[1]  Plaintiff has brought state law claims for assault (Count Seven) and battery (Count

Eight) against Town Defendants.  (*See id.* ¶¶ 113–20.)  The Court will first evaluate the claims

against Access Defendants, followed by the claims against Town Defendants.

1.  Claims Against Access Defendants

As noted, Plaintiff has brought § 1983 claims and state law claims against various Access

Defendants.  The Court will address Plaintiff's § 1983 claims first.

a.  Plaintiff's § 1983 Claims

Access Defendants argue that Altieri and Doe are not "state actors" and, thus, may not be

held liable under § 1983.  (*See* Access Defs.' Mem. of Law in Supp. of Mot. To Dismiss

---

[1] Plaintiff has also named the County as a Defendant in Count Six, (Compl. ¶¶ 108–12), and has named both Miller and the County as Defendants in Count Nine, (*id.* ¶¶ 121–25). Because County Defendants have not moved to dismiss the Complaint, the Court need not consider these claims with respect to Miller and the County.

("Access Defs.' Mem.") 5–21 (Dkt. No. 38).)  They seek to dismiss Counts Two, Three, and Five on this basis.  (*See id.*)

The Supreme Court has explained that "[t]he purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."  *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).  "A plaintiff pressing a claim of violation of his constitutional rights under § 1983 is thus required to show state action."  *Tancredi v. Metro. Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003).  To constitute state action, there must be an alleged deprivation of a federal right "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible," and "the party charged with the deprivation must be a person who may fairly be said to be a state actor."  *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982).

"Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character" that it can be regarded as governmental action. *Evans v. Newton*, 382 U.S. 296, 299 (1966); *see also Hollander v. Copacabana Nightclub*, 624 F.3d 30, 34 (2d Cir. 2010) (per curiam) (recognizing that "actions of nominally private entities are attributable to the state" under certain circumstances).  For a private entity to become a state actor for purposes of § 1983, "there must be such a close nexus between the state and the challenged action that the state is *responsible* for the specific conduct of which the plaintiff complains."  *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012) (alteration and quotation marks omitted).  "Action taken by private entities with the mere approval or acquiescence of the State is not state action."  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999).  Although

there is "no single test to identify state actions and state actors," *Cooper v. U.S. Postal Serv.*, 577

F.3d 479, 491 (2d Cir. 2009) (citation omitted), three main tests have emerged:

> For the purposes of [§] 1983, the actions of a nominally private entity are
> attributable to the state . . . (1) [when] the entity acts pursuant to the coercive power
> of the state or is controlled by the state ("the compulsion test"); (2) when the state
> provides significant encouragement to the entity, the entity is a willful participant
> in joint activity with the state, or the entity's functions are entwined with state
> policies ("the joint action test" or "close nexus test"); or (3) when the entity has
> been delegated a public function by the state, ("the public function test").

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (per

curiam) (alterations and some quotation marks omitted); *see also Hollander*, 624 F.3d at 34

(same).  The "ultimate issue" in this analysis is whether the private entity's actions are "fairly

attributable" to the state.  *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982).

"In analyzing whether a private entity acts under color of state law for purposes of

§ 1983, [courts] begin by identifying the specific conduct of which the plaintiff complains, rather

than the general characteristics of the entity."  *Fabrikant*, 691 F.3d at 207 (citation and

quotations marks omitted).  Here, the Court will first consider Plaintiff's complaint that Altieri

"falsely informed" Miller that Plaintiff was behaving in such a way that suggested he posed a

harm to himself or to others, thereby setting in motion the events to follow.  (*See* Compl. ¶ 41.)

Having assessed this conduct, the Court will then turn to consider the allegation that Altieri

"importuned" the police to arrest Plaintiff, and that she and Doe then "participated" in his

seizure.  (*Id.* ¶¶ 51, 57.)

Under the compulsion test, "a State normally can be held responsible for a private

decision only when it has exercised coercive power or has provided such significant

encouragement, either overt or covert, that the choice must in law be deemed to be that of the

State."  *Doe v. Rosenberg*, 996 F. Supp. 343, 348–49 (S.D.N.Y. 1998) (quoting *Blum v. Yaretsky*,

457 U.S. 991, 1004 (1982)), *aff'd*, 166 F.3d 507 (2d Cir. 1999).  But as Judge Sweet explained in

*Rosenberg*, the MHL "neither compels nor encourages involuntary commitment," but "simply

sets forth a mechanism to effect involuntary commitments when necessary."  996 F. Supp. at

349.  In *Rosenberg*, the plaintiff had been involuntarily hospitalized under MHL § 9.27 after her

primary care physician wrote a medical order authorizing hospital security to transport her to the

psychiatric emergency room for an evaluation.  *Id.* at 346–47.[2]  Although none of the physicians

involved in her commitment was a state employee, she brought a § 1983 action against them and

the private hospital where she was detained, arguing that the defendants were state actors

"because they derived the authority to commit her from the laws of New York State."  *Id.* at

346–48.  Applying the compulsion test, the court observed that the language of MHL § 9.27 is

"permissive," providing that a hospital director "may" commit a mentally ill patient.  *Id.* at 349

(citing MHL § 9.27(a)).  The statute's use of the word "may," the court explained, indicates "the

lack of encouragement or exercise of coercive power by the state, factors that must exist under

the state compulsion test."  *Id.* (citing *Blum*, 457 U.S. at 1004).  Thus, although the MHL

supplies a "legal framework" for doctors to perform involuntary commitments, it leaves the

decision whether to commit a patient "completely to the physician's discretion."  *Id.* at 350.

Because states are "not liable for determinations that 'ultimately turn on medical judgments

made by private parties according to professional standards that are not established by the

State,'" *id.* (quoting *Blum*, 457 U.S. at 1008), the court held that the actions of the defendants

---

[2] Section 9.27 provides in relevant part that "[t]he director of a hospital may receive and retain therein as a patient any person alleged to be mentally ill and in need of involuntary care and treatment upon the certificates of two examining physicians, accompanied by an application for the admission of such person."  N.Y. Mental Hyg. Law § 9.27(a).

could not be attributed to New York State "under a theory of state compulsion," *id.* at 352.  Thus, compliance with the MHL's procedures "does not convert private action into state action."  *Id.*

Drawing on *Rosenberg*, another court in this District recently applied the same analysis to a mobile mental health crisis team like the one in this case.  *See Mejía v. Robinson*, No. 16-CV-9706, 2018 WL 3821625, at *4–5 (S.D.N.Y. Aug. 10, 2018).  In *Mejía*, two members of a private hospital's mobile crisis team had called the police to have the plaintiff removed from his house and taken to the psychiatric department at a local hospital.  *Id.* at *1.  After the plaintiff was involuntarily detained for six days, he brought § 1983 claims against the mobile crisis team members, arguing that they constituted state actors because they had acted jointly with the New York Police Department.  *Id.* at *1, *3.  Following Judge Sweet's approach in *Rosenberg*, the court looked to the language of the relevant statutory provision, MHL § 9.58, which provides in relevant part:

> A physician or qualified mental health professional who is a member of an approved mobile crisis outreach team *shall have the power* to remove, or . . . to direct the removal of any person to a hospital . . . for the purpose of evaluation for admission if such person appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others.

N.Y. Mental Hyg. Law § 9.58(a) (emphasis added).  The court found that this provision, like the provision examined in *Rosenberg*, "is permissive, and not mandatory."  *Mejía*, 2018 WL 3821625, at *5 (citing *Rosenberg*, 996 F. Supp. at 349).  In other words, the provision vests in mental health professionals the authority to effect involuntary removals, but it does not *compel* them to do so.  *Cf. Rosenberg*, 996 F. Supp. at 352–53 (observing that although the MHL "licenses private physicians and hospitals to commit involuntary commitments," it "in no way influences the decisions to commit").

The same is true of MHL § 9.45, which uses similar language as § 9.58 and provides that:

> The director of community services or the director's designee *shall have the power* to direct the removal of any person, within his or her jurisdiction, to a hospital . . . or to a comprehensive psychiatric emergency program . . . if . . . a licensed psychologist, registered professional nurse or certified social worker currently responsible for providing treatment services to the person, . . . health officer, peace officer[,] or police officer reports to him or her that such person has a mental illness for which immediate care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others.

N.Y. Mental Hyg. Law § 9.45 (emphasis added).  A person removed pursuant to this section "may then be retained" pursuant to separate provisions of the statute.  *Id.*  Like §§ 9.27 and 9.58 of the MHL, § 9.45 is also "permissive, and not mandatory."  *See Mejía*, 2018 WL 3821625, at *5.  Although § 9.45 provides a "legal framework" for qualified professionals to effectuate an involuntary removal, it "leaves the decision to [direct the removal] completely to the [mental health professional's] discretion."  *Rosenberg*, 996 F. Supp. at 350.  As in *Mejía*, Plaintiff cites no authority suggesting "that a mobile crisis team acting pursuant to the MHL is compelled by the law to act."  *Mejía*, 2018 WL 3821625, at *5.  Likewise, "Plaintiff's allegations do not suggest that the State of New York or the [Town or County] coerced or provided significant encouragement to [Altieri] to investigate Plaintiff's home or to have [him] removed from his home."  *Id.*  As in *Mejía*, then, there is no allegation of state compulsion.

Although Plaintiff does allege that Altieri "never provided treatment services" to Plaintiff, (Compl. ¶ 45), this allegation establishes at most that Altieri may not qualify as a "registered professional nurse or certified social worker currently responsible for providing treatment services to the [removed] person," N.Y. Mental Hyg. Law § 9.45.  But it does not follow that Altieri "was not a proper source of information under § 9.45," (Compl. ¶ 47), for Altieri may fall under one of the other categories of qualified professionals identified in § 9.45,

such as a "licensed psychologist" or "health officer," *see* N.Y. Mental Hyg. Law § 9.45.[3]  And

although Plaintiff alleges that his removal took place pursuant to § 9.45 of the MHL, (*see* Compl.

¶ 42), it seems at least plausible that the removal was also effectuated pursuant to § 9.58 of the

statute, which, as noted, authorizes removal by a "qualified mental health professional who is a

member of an approved mobile crisis outreach team," *see* N.Y. Mental Hyg. Law § 9.58(a).  In

sum, Plaintiff fails to allege that Altieri was not acting pursuant to the MHL.

Because Altieri was acting pursuant to the MHL, her actions "cannot be attributed to the

[s]tate under a theory of state compulsion." *Rosenberg*, 996 F. Supp. at 352.  For the same

reasons outlined in *Rosenberg* and *Mejía*, Altieri does not constitute a state actor under the

compulsion test.

"The close nexus test requires that a [p]laintiff demonstrate 'a sufficiently close nexus

between the State and the challenged action of the [private] regulated entity so that the action of

the latter may be fairly treated as that of the State itself.'" *Mejía*, 2018 WL 3821625, at *6

(second alteration in original) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)).

Plaintiff argues that the agreement between the County and Access Inc. supplies such a nexus.

---

[3] Plaintiff alleges that "[t]he representation that [D]efendant . . . Altieri was a licensed psychologist, registered professional nurse [or] certified [s]ocial [w]orker currently responsible for providing treatment services to [P]laintiff . . . was false." (Compl. ¶ 46.)  The basis for this conclusion seems to be the antecedent allegation that Altieri never provided treatment services to Plaintiff.  (*Id.* ¶ 45.)  But the conclusion in ¶ 46 does not entirely follow from the allegation in ¶ 45.  MHL § 9.45 uses commas to denote discrete categories of professionals who are authorized to recommend the removal of a mentally ill person.  *See* N.Y. Mental Hyg. Law § 9.45.  These commas indicate that a (1) "licensed psychologist" and a (2) "registered professional nurse or certified social worker currently responsible for providing treatment services to the person" are *two distinct categories* of professionals who may recommend removal.  *See id.*  Thus, although Altieri may not qualify under the latter category, based on the fact that she did not treat Plaintiff, Plaintiff does not allege facts indicating that Altieri was not "a licensed psychologist."

(*See* Pl.'s Mem. of Law in Opp'n to Access Defs.' Mot. ("Pl.'s First Opp'n") 16, 18–20 (Dkt. No. 42).)  As a procedural matter, the Court will not consult or consider the actual contract between the County and Access Inc., nor will it consider any arguments based on the contents of this contract.  (*See id.* at 18–20.)  Plaintiff provided this contract for the first time as an attachment to the attorney declaration filed in support of his Opposition.  (*See* Decl. of Eugene M. Bellin, Esq., in Supp. of Pl.'s Opp'n ("Bellin Decl.") Exs. 1–4 (Dkt. Nos. 41, 41-1, 41-2, 41-3, 41-4).)  It is axiomatic that courts deciding a motion to dismiss may consider "'the facts as asserted within the four corners of the complaint' together with 'the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference.'"  *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (citation omitted).  Because Plaintiff's supplemental exhibits were not attached to his Complaint or incorporated by reference therein, the Court will not consider them here.

The Complaint nevertheless alleges that there was an "agreement" between the County and Access Inc. pursuant to which Access Inc. "agreed to perform certain services" of the County's mental health department, including the operation of the Mobile Mental Health Team. (Compl. ¶ 13.)  This does not satisfy the close nexus test.  In *Rosenberg*, the court held that although the private hospital had a contract with New York's Office of Mental Health enabling it to operate a psychiatric wing, that contract did not transform the hospital's private actions—or those of its employees—into state action.  *Rosenberg*, 996 F. Supp. at 352; *see also Rendell-Baker*, 457 U.S. at 841 ("Acts of . . . private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts."); *Cooper*, 577 F.3d at 492 (observing that a "contract with the government does not convert [a private entity's] conduct into state action"); *Doe v. Harrison*, 254 F. Supp. 2d 338, 344

(S.D.N.Y. 2003) (explaining that the "privatization of an activity such as civil commitment that is not a 'public function[]' does not mandate an analogous constitutional scrutiny of private actors performing the activity").  In *Coppola v. Blarcum*, No. 17-CV-1032, 2020 WL 6888051 (N.D.N.Y. Nov. 24, 2020), the plaintiff brought § 1983 claims against two Access Inc. employees who were members of a mobile mental health team, *id.* at *2.  There, Access Inc. provided "mobile mental health services"—including "clinical assessments and intervention services for people in crisis or extreme need"—"[p]ursuant to a contract with Ulster County, [New York]."  *Id.* (brackets and record citation omitted).  On summary judgment, the court held that the Access Inc. employees were not state actors, observing in part that "[t]he existence of a contract does not by itself render all of the contractor's conduct state action."  *Id.* at *12 (citation omitted).[4]  As *Rosenberg* and *Coppola* make clear, any agreement between Access Inc. and the County does not transform the conduct of Access Inc. employees into state action.  Even if the Complaint had alleged that there was extensive state funding, licensing, and regulation of Access Inc., such allegations, without more, would still prove insufficient to establish state action.  *See Rosenberg*, 996 F. Supp. at 352.  Plaintiff has failed to allege that Altieri and Doe were functioning as state actors pursuant to the "close nexus" test.

Finally, "[u]nder the public function test, the required nexus may be present if the private entity has exercised powers that are traditionally the exclusive prerogative of the State."  *Mejía*,

---

[4] In a letter submitted after the close of briefing, Plaintiff's counsel attempts to distinguish *Coppola* on various grounds.  (*See* Letter from Eugene M. Bellin, Esq., to Court (Dec. 2, 2020) ("Dec. 2 Bellin Letter") 1–2 (Dkt. No. 49).)  His suggestion that *Coppola* is inapposite because it involved a motion for summary judgment, rather than a motion to dismiss, is not persuasive.  (*See id.* at 1.)  The legal principle illustrated by *Coppola*—namely, that a contract alone does not suffice to convert private action into state action—applies regardless of the particular stage in a litigation.  Insofar as Plaintiff seeks to distinguish *Coppola* using facts derived from the putative contract between the County and Access Inc. here, (*see id.*), the Court does not consider those arguments for the reasons stated above.

2018 WL 3821625, at *6 (quotation marks omitted) (quoting *Blum*, 457 U.S. at 1005). But as the court explained in *Rosenberg*, deciding that an individual requires psychiatric treatment and authorizing his transportation to a medical facility "has never been within the exclusi[ve] function of the State." 996 F. Supp. at 357. Indeed, pursuant to the MHL, "[a] father, mother, sister, brother, husband, wife, or any person with whom the [allegedly mentally ill person] resides could secure such an evaluation, or request the person be taken into custody . . . for the purposes of obtaining a psychiatric evaluation." *Id.* (citing N.Y. Mental Hyg. Law § 9.27(b)). In *Rosenberg*, therefore, the court held that the doctor who had authorized the plaintiff's transport to the psychiatric emergency room for evaluation was not a state actor. *See id.* at 357–58 ("A private physician does not trigger state action when he or she determines a patient is in need of immediate psychiatric evaluation and takes steps necessary to facilitate that evaluation."). The court also rejected the theory that this doctor could be held liable for the plaintiff's detention by virtue of having "set in motion the events that eventually led to her civil commitment." *Id.* at 357. Having found that involuntary commitment itself was not an exclusive state function, *see id.* at 355–56, the court concluded, "[a] *fortiori*, [that] actions taken by a private physician to set the ball rolling so that involuntary commitment might be a possibility certainly do not equal state action." *Id.* at 357.

The court in *Mejía* borrowed this reasoning in concluding that members of the mobile mental health crisis team in that case were not state actors for purposes of § 1983. *See Mejía*, 2018 WL 3821625, at *6–7. "The act of calling the police," the court observed, "is not a power reserved exclusively to the state. If that were the case, every good Samaritan who dialed 9-1-1 could be deemed a state actor." *Id.* at *7. Thus, "a request by a mobile crisis team employed by a private hospital for the police to remove an individual pursuant to the MHL, without more,

does not satisfy the public function test." *Id.* This reasoning is equally applicable in the instant case. As *Rosenberg* and *Mejía* make clear, Altieri's act of reporting allegedly abnormal behavior in order to have Plaintiff transported for a psychiatric evaluation is not an *exclusive* state function, and thus, her conduct does not constitute a state action under the public function test.

Plaintiff argues that Altieri's "active participation" in Plaintiff's seizure distinguishes this case from *Rosenberg* and *Mejía*. (Pl.'s First Opp'n 16–17.) He suggests that this case is more analogous to *Vivar v. City of New York*, No. 18-CV-5987, 2020 WL 1505654 (S.D.N.Y. Mar. 30, 2020). (*See* Pl.'s First Opp'n 15–16.) But in *Vivar*, the allegations indicated that employees of a nonprofit organization were acting in concert with state actors to harass the plaintiff unlawfully. There, the plaintiff had allegedly called the police after one of the nonprofit employees showed up at his door. *Id.* at *9. When the police arrived, they "rushed in without permission," along with the nonprofit employee and other employees from the organization. *Id.* The plaintiff alleged that he "'was not threatening anyone, physically attacking anyone, or causing any disturbance of any kind,' and the police had no warrant or exigent circumstances to justify their entry." *Id.* (record citation omitted). Moreover, the plaintiff alleged that the nonprofit employee had falsely told the police—right as they were entering his apartment—that the plaintiff had tried to use a knife on him. *Id.* Finally, the plaintiff had alleged that the nonprofit employee was sent to his home "because of the various complaints [the] [p]laintiff [had] made . . . regarding" employees of the organization, and that, after the incident, one of the employees said, "you report people[,] that's what you get." *Id.* at *10 (record citations omitted). In light of these allegations, the court found that the plaintiff had plausibly alleged that the nonprofit employees were acting in concert with the police and the New York City Human Resources Administration

("HRA") to advance the "common unlawful goal" of harassing the plaintiff "to pressure him into ceasing his complaints about [the nonprofit organization] and [the] HRA." *Id.*

*Vivar*, then, is readily distinguishable. Whereas the private actors in *Vivar* were allegedly collaborating with state actors to advance an unlawful vendetta, Plaintiff has failed to allege that Altieri and Doe were not acting pursuant to the MHL. Unlike the nonprofit employees in *Vivar*, Altieri and Doe were responding to (what they interpreted as) an emergency situation. And although Plaintiff, like the plaintiff in *Vivar*, has alleged that his seizure was based on false information, there is a critical distinction between the two cases. In *Vivar*, the private actor allegedly gave false information directly to the police, right as they entered the plaintiff's home, in a manner seemingly calculated to provoke an aggressive response by the police. Here, by contrast, Altieri first conveyed the allegedly false report to Miller, who then decided to involve the police by issuing the Removal Order. Moreover, Plaintiff does not allege that Altieri provided this false information in a collaborative effort to visit state violence upon Plaintiff, as was seemingly the case in *Vivar*. The allegedly false information was that Plaintiff may have posed a harm to himself or to others. Even accepting Plaintiff's allegation as true, therefore, the false information was intended at least in part to *protect* Plaintiff.

Thus, the nature of Altieri's conduct in this case is fundamentally different from that of the private actors in *Vivar*. Nevertheless, Plaintiff argues that Altieri "was an active participant in the seizure and confinement of [P]laintiff," (Pl.'s First Opp'n 14), a claim that most naturally implicates the "close nexus" theory of state action. In the Court's view, this argument asks more of the Complaint than it can bear. Plaintiff identifies several discrete actions that would supposedly suggest "a sufficiently close nexus between the State and the challenged action of [Altieri]" such that the "action of the latter may be fairly treated as that of the State itself."

*Mejía*, 2018 WL 3821625 at *6 (quoting *Jackson*, 419 U.S. at 351).  First, Altieri allegedly

"provided false information to" Miller.  (*See* Pl.'s First Opp'n 14; Compl. ¶ 41.)  For reasons

discussed *supra*, this action does not convert Altieri into a state actor, and the allegation that the

information was false is immaterial.  That the information may have been false does not

transform an otherwise private action into state action.  Second, Plaintiff argues that Altieri is a

state actor because she "delivered the [R]emoval [O]rder" to the police and "importuned" them

"to enter the [P]laintiff's home, seize the [P]laintiff, and remove the [P]laintiff to a hospital."

(*See* Pl.'s First Opp'n 14; Compl. ¶¶ 49, 51.)  But these arguments are identical—in substance if

not in form—to the first argument.  If requesting that police remove an individual pursuant to the

MHL does not constitute state action, it is unclear how the distinct act of *conveying* that request

to the police, or of making that request *in person*, could be any different.  *Cf. Mejía*, 2018 WL

3821625, at *7 ("[A] request by a mobile crisis team employed by a private hospital for the

police to remove an individual pursuant to the MHL, without more, does not satisfy the public

function test.")  By Plaintiff's reasoning, every private citizen who visits his local police precinct

and "importunes" the police to take some action would be transformed into an instrument of the

state.  That cannot be true.  *Cf. id.* (observing that if the "act of calling the police" were a power

reserved exclusively to the state, then "every good Samaritan who dialed 9-1-1 could be deemed

a state actor").  Plaintiff also argues that Altieri accompanied the police to his home and

"participated" in the forcible entry and seizure.  (Pl.'s First Opp'n 14; Compl. ¶¶ 52–57.)  But the

Complaint is devoid of any allegations explaining how Altieri and Doe allegedly "participated"

in the seizure, apart from being *present* at the scene.  Their mere presence, without more, does

not constitute state action.  In *Coppola*, for example, the Access Inc. employees were both

present while the plaintiff was being arrested.  *See* 2020 WL 6888051, at *3–4.  As noted, however, the court concluded that these employees were not state actors.  *See id.* at *12–13.[5]

Because Plaintiff fails to allege facts showing that Altieri and Doe were functioning as state actors, his § 1983 claims against these Defendants for unlawful search and seizure, false imprisonment, and excessive force cannot survive Access Defendants' Motion.  Accordingly, Counts Two, Three, and Five are dismissed with respect to Altieri and Doe.

### b.  Plaintiff's State-Law Claims

Plaintiff also brings state law trespass and false imprisonment claims against Altieri, Doe, and Access Inc.  (Compl. ¶¶ 108–12, 121–25.)  The Court has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  "Claims are part of the same case or controversy if they derive from a common nucleus of operative fact[s]."  *SAT Int'l Corp. v. Great White Fleet (US) Ltd.*, No. 03-CV-7481, 2006 WL 661042, at *5 (S.D.N.Y. Mar. 16, 2006) (citation omitted).  Here, Plaintiff's

---

[5] Although *Mejía* found an absence of state action where the "mobile crisis team [had] left [the plaintiff's] apartment before calling the police, . . . [had not] returned or otherwise worked jointly with the police," and had not decided "to contact the police . . . jointly with the NYPD or any other state actor," 2018 WL 3821625, at *6, the Court is not persuaded that *merely returning* to Plaintiff's home with the police transforms Altieri and Doe into state actors, nor is it persuaded that Miller's involvement in issuing the Removal Order transforms Altieri's conduct into state action.  Insofar as Plaintiff interprets *Mejía* to dictate a contrary result, (*see* Pl.'s First Opp'n 16–17), the Court disagrees.  *Mejía* did not say that the factors it identified constitute *per se* indicia of state action, and it provided no authority that would suggest as much.  (Indeed, the portion of *Mejía* quoted above cites *no* supporting case law.)  There may, of course, be circumstances where the factors identified by *Mejía* indicate that otherwise private conduct has morphed into state action.  The facts in *Vivar* would present one such example.  But under the unique facts of this case, and for the reasons already discussed in detail *supra*, the Court is not convinced that Altieri and Doe's mere presence during the arrest, or the fact that Miller issued the Removal Order upon Altieri's report, transforms Altieri and Doe's conduct into state action.

state and federal claims arise out of a common nucleus of operative facts, namely Plaintiff's

seizure and transportation to Orange Regional.

Nevertheless, because the Court dismisses Plaintiff's § 1983 claims against Altieri and

Doe, "it is within [the Court's] discretion whether to exercise supplemental jurisdiction over

[P]laintiff's state law claims." *Rosato v. N.Y. Cnty. Dist. Attorney's Office*, No. 09-CV-3742,

2009 WL 4790849, at *4 (S.D.N.Y. Dec. 14, 2009).  "It is well settled that where, as here, the

federal claims are eliminated in the early stages of litigation, courts should generally decline to

exercise pendent jurisdiction over remaining state law claims." *Klein & Co. Futures, Inc. v. Bd.*

*of Trade of City of N.Y.*, 464 F.3d 255, 262 (2d Cir. 2006); *see also Fisk v. Letterman*, 501 F.

Supp. 2d 505, 528 (S.D.N.Y. 2007) ("When all federal claims are dismissed, district courts

should generally decline to exercise supplemental jurisdiction over pendent state law claims.");

*Torres v. City of New York*, 248 F. Supp. 2d 333, 334 (S.D.N.Y. 2003) ("Where the basis for

pendent jurisdiction is dismissed, ordinarily so should the state law claims be dismissed.").

Accordingly, the Court declines to exercise jurisdiction over Plaintiff's state law claims against

Altieri and Doe and dismisses them without prejudice.  *See Masciotta v. Clarkstown Cent. Sch.*

*Dist.*, 136 F. Supp. 3d 527, 547–48 (S.D.N.Y. 2015) (declining to exercise jurisdiction over the

plaintiff's state law claims where the federal claims had been dismissed); *Rennalls v. Alfredo*,

No. 12-CV-5300, 2015 WL 5730332, at *12 (S.D.N.Y. Sept. 30, 2015) (declining to exercise

jurisdiction over the plaintiff's state law claims against certain defendants where the federal

claims against those defendants had been dismissed, but exercising pendent jurisdiction over

state law claims against a different set of defendants against whom the federal claims had

survived); *Hoffman v. County of Delaware*, 41 F. Supp. 2d 195, 216 (N.D.N.Y. 1999) ("Having

dismissed all federal claims against [certain defendants], there remains no independent basis for

exercising federal jurisdiction over those defendants and, accordingly, the pendent state law claims against them must be dismissed."); *Rosenberg*, 996 F. Supp. at 358 ("Since the parties are in an early stage of the case and the federal claims have been dismissed, leaving no independent basis of jurisdiction over the remaining state claims, they will also be dismissed.").[6]  Having dismissed all federal claims against Altieri and Doe, the Court will not consider the state law trespass and false imprisonment claims Plaintiff asserts against Access Inc. on a theory of respondeat superior.  (*See* Compl. ¶¶ 12, 24 (alleging that Altieri and Doe were acting within the scope of their employment); Pl.'s First Opp'n 22.)  Accordingly, the claims against Access Inc. are also dismissed without prejudice.

---

[6] In *Mejía*, the court said that "[t]he Second Circuit has made clear that a district court may not decline to exercise jurisdiction over state law claims where federal claims remain against other defendants and the state law claims 'form part of the same case or controversy.'" 2018 WL 3821625, at *7 (citation omitted).  In the Court's view, this is not an accurate characterization of the law.  It is true that in one of the two cases *Mejía* cited for its proposition— *Ciambriello v. County of Nassau*, 292 F.3d 307 (2d Cir. 2002)—the Second Circuit decided to reinstate state law claims against a defendant who had no federal claims pending against it, observing that these claims formed part of the same case or controversy as other, § 1983 claims that the court had reinstated against different defendants.  *Id.* at 325.  But the court did not announce a sweeping rule that district courts "may not decline to exercise jurisdiction over state law claims [that form part of the same case or controversy as] . . . federal claims remain[ing] against other defendants."  *See Mejía*, 2018 WL 3821625, at *7.  Indeed, the second (and more recent) Second Circuit case cited by *Mejía*—*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296 (2d Cir. 2004)—contradicts such a rule.  In *Briarpatch*, the Second Circuit acknowledged that for purposes of supplemental jurisdiction, a state law claim may still form part of the same case or controversy as a federal claim, even if it "is asserted against a party different from the one named in the federal claim."  *Id.* at 308.  But as the court also observed, "[t]he fact that the district court has the power to hear [such a] supplemental claim[] does not mean, of course, that it must do so."  *Id.*  "This decision," rather, "is left to the exercise of the district court's discretion."  *Id.*  With the exception of *Mejía*, the Court is aware of no authority within this Circuit which says that a district court *must* consider claims such as the state law claims levied against Access Defendants here.  In keeping with the weight of authority on this topic, the Court has exercised its discretion in deciding whether to exercise supplemental jurisdiction over these claims.

<u>2.  Claims Against Town Defendants</u>

<u>a.  Plaintiff's § 1983 Claims</u>

Pursuant to § 1983, Plaintiff has brought claims for unreasonable search and seizure (Count Two), false imprisonment (Count Three), and excessive force (Count Four) against Individual Town Defendants.  (*See* Compl. ¶¶ 75–101.)  The Court will address each in turn.

<u>i.  Unreasonable Search and Seizure (Count Two)</u>

Individual Town Defendants raise five arguments with respect to Plaintiff's unlawful seizure claim: first, they acted lawfully pursuant to MHL § 9.45, (*see* Town Defs.' Mem. of Law in Supp. of Mot. To Dismiss ("Town Defs.' Mem.") 4–7 (Dkt. No. 40)); second, they acted lawfully pursuant to MHL § 9.41, (*see id.* at 7–9); third, they had probable cause for the seizure, (*see id.* at 9–12); fourth, they are entitled to qualified immunity, (*see id.* at 17–22); and fifth, they are entitled to immunity pursuant to MHL § 9.59, (*see id.* at 13).  The second and third arguments constitute one overlapping argument that Individual Town Defendants had probable cause for the seizure, and thus, the Court will address this argument first.  *See Kerman v. City of New York*, 261 F.3d 229, 235 (2d Cir. 2001) (indicating that courts should "first address" whether "a constitutional violation [has occurred] at all," before reaching the issue of qualified immunity).  The Court will then consider Individual Town Defendants' qualified immunity argument, followed by their argument based on MHL § 9.45.  The Court will address the argument based on MHL § 9.59 last.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  "A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, by means of physical force or show of authority, in

some way restrained the liberty of a citizen." *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)

(citation, quotation marks, and ellipsis omitted); *see also Glass v. Mayas*, 984 F.2d 55, 58 (2d

Cir. 1993) (same). The Fourth Amendment's protections apply to involuntary hospitalizations

such as the one in this case. *See Glass*, 984 F.2d at 58; *see also Myers v. Patterson*, 819 F.3d

625, 632 (2d Cir. 2016) (stating that the Fourth Amendment "protection adheres whether the

seizure is for purposes of law enforcement or due to an individual's mental illness"). Here, there

can be no question that a Fourth Amendment "seizure" occurred, a fact which Individual Town

Defendants do not contest, (*see* Town Defs.' Mem. 5).

Whether this seizure amounted to a constitutional violation, however, depends on

whether the officers had probable cause to enter Plaintiff's home and forcibly transport him to

the hospital. Although "[w]arrantless searches are presumptively unreasonable," it is also true

that "police officers may enter a dwelling without a warrant to render assistance to a person

whom they reasonably believe to be in distress." *Kerman*, 261 F.3d at 235 (ellipsis omitted)

(quoting *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998)). Thus, in the context of an

involuntary hospitalization, a seizure does not violate the Fourth Amendment if it is based on

probable cause. *See Fisk*, 501 F. Supp. 2d at 526; *Kusak v. Klein*, No. 11-CV-6557, 2015 WL

510053, at *5 (W.D.N.Y. Feb. 6, 2015) ("[A]n involuntary civil commitment—such as under the

MHL—based upon probable cause does not violate the Fourth Amendment."); *see also Myers*,

819 F.3d at 632 ("To handcuff and detain, even briefly, a person for mental-health reasons, an

officer must have 'probable cause to believe that the person presented a risk of harm to herself or

others.'" (brackets and citation omitted)); *Vallen v. Connelly*, No. 99-CV-9947, 2004 WL

555698, at *7 (S.D.N.Y. Mar. 19, 2004) (stating that "the Fourth Amendment requires an official

to have probable cause to believe that a person is dangerous to himself or others before he can

seize and detain such person for a psychiatric evaluation").  Moreover, "a showing of probable

cause in the mental health seizure context requires only a probability or substantial chan[c]e of

dangerous behavior, not an actual showing of such behavior."  *Heller v. Bedford Cent. Sch. Dist.*,

144 F. Supp. 3d 596, 622 (S.D.N.Y. 2015) (citation omitted), *aff'd*, 665 F. App'x 49 (2d Cir.

2015); *see also M.C. v. County of Westchester*, No. 16-CV-3013, 2020 WL 7481023, at *10

(S.D.N.Y. Dec. 18, 2020) (same); *Quon v. Henry*, No. 14-CV-9909, 2017 WL 1406279, at *6

(S.D.N.Y. Mar. 27, 2017) (same).

Individual Town Defendants argue that they acted lawfully pursuant to MHL § 9.41,

which provides in relevant part:

> Any . . . police officer who is a member of the state police or of an authorized police
> department or force or of a sheriff's department may take into custody any person
> who appears to be mentally ill and is conducting himself or herself in a manner
> which is likely to result in serious harm to the person or others.  Such officer may
> direct the removal of such person or remove him or her to any hospital specified in
> subdivision (a) of section 9.39 or any comprehensive psychiatric emergency
> program specified in subdivision (a) of section 9.40 . . . .

N.Y. Mental Hyg. Law § 9.41.  The Second Circuit "interpret[s] this provision consistently with

the requirements of the Fourth Amendment," and thus, "the same objective reasonableness

standard is applied to police discretion under this section."  *Kerman*, 261 F.3d at 240 n.8.

Accordingly, the relevant inquiry under MHL § 9.41 is the same as that under the constitutional

analysis, namely whether the officers had probable cause to seize Plaintiff.  *See Greenaway v.

County of Nassau*, 97 F. Supp. 3d 225, 233 (E.D.N.Y. 2015) ("Where the plaintiff has been

involuntarily confined under [MHL] § 9.41, courts apply the same concepts of probable cause

and objective reasonableness as in criminal cases to determine whether the confinement is

privileged because the plaintiff's behavior was likely to result in serious harm.").  It is

unsurprising, then, that Individual Town Defendants' argument with respect to § 9.41 is virtually

indistinguishable from their probable cause argument.  (*Compare* Town Defs.' Mem. 7–9, *with id.* at 9–12.)  Because the Court's "constitutional analysis [under the Fourth Amendment] controls this state law issue as well," *Kerman*, 261 F.3d at 240 n.8, the Court will treat these two arguments as one.

The probable cause determination requires a fact-intensive analysis, "converg[ing] on whether facts and circumstances known to the officers at the time they seized [P]laintiff were sufficient to warrant a person of reasonable caution to believe that [Plaintiff] might be mentally ill and conducting [himself] in a manner likely to result in serious harm to [himself]." *Guan v. City of New York*, No. 18-CV-2417, 2020 WL 6688855, at *9 (S.D.N.Y. Sept. 18, 2020) (report and recommendation) (quoting *Nicholas v. City of Binghamton*, No. 10-CV-1565, 2012 WL 3261409, at *5 (N.D.N.Y. Aug. 8, 2012)).  Accordingly, courts "must review the specific observations and information available to the officers at the time of a seizure." *Myers*, 819 F.3d at 633.  If a court lacks enough information to make a probable cause determination at the motion to dismiss stage, it must deny the motion. *See, e.g.*, *Biswas v. City of New York*, 973 F. Supp. 2d 504, 521 (S.D.N.Y. 2013) (denying motion to dismiss in relevant part where the court could not "determine, at th[at] stage and as a matter of law, that it was objectively reasonable for the officers to find probable cause"); *Bullard v. City of New York*, 240 F. Supp. 2d 292, 299 (S.D.N.Y. 2003) (denying a motion to dismiss false arrest and malicious prosecution claims where the court could not find as a matter of law, based on the allegations in the complaint, that the defendants had probable cause for their actions).

Here, Individual Town Defendants argue that the officers had probable cause to seize Plaintiff based on several factors "*in addition to* the [Removal] Order."  (Town Defs.' Mem. 7 (emphasis added).)  Thus, before addressing these other factors, the Court will consider whether

the bare existence of the Removal Order, without more, gives rise to probable cause.  The only pertinent facts alleged in the Complaint—i.e., the only facts the Court may consider at this stage—are that (1) Altieri "falsely informed" Miller that Plaintiff "was exhibiting behavior indicating that he was in immediate need of care and treatment for a mental illness which was likely to result in serious harm to himself or to others," (*id.* ¶ 41); (2) Miller issued the Removal Order based on this representation, (*id.* ¶¶ 42–43); (3) Altieri delivered the Removal Order to the Town Police and encouraged Individual Town Defendants to remove Plaintiff, (*id.* ¶¶ 49–51); and (4) Individual Town Defendants subsequently did seize Plaintiff and transport him to Orange Regional, (*id.* ¶¶ 56, 59).  Based on these facts alone, the Court lacks sufficient information to determine whether the officers had probable cause for the seizure.  Notably, the Complaint does not include the basis for Altieri's allegedly false report.  It does not specify, for example, what Altieri allegedly observed Plaintiff do, or what she heard him say, that gave rise to her conclusion that he needed immediate treatment.  As noted, a finding of probable cause turns on the particularities of each case and the unique circumstances confronting an officer at the time the seizure occurred.  Thus, the Court may not conclude there was probable cause based on the vague characterization that Plaintiff may have been "exhibiting behavior indicating that he was in immediate need of care and treatment for a mental illness which was likely to result in serious harm to himself or to others."  (*Id.* ¶ 41.)  In any event, Plaintiff says this report was "false[]," (*id.*)—an allegation the Court must accept at this stage of the case.  Even if the Court knew the facts underpinning Altieri's conclusion, the Complaint does not specify what information Individual Town Defendants had when they seized Plaintiff.  The Complaint merely alleges that Altieri delivered the Removal Order to the Town Police and exhorted the officers to make an arrest.  But the Court does not know what details, if any, were included in the Removal Order, or

whether Individual Town Defendants were apprised of these details.  The Court does not know what information, if any, Altieri directly provided to them about Plaintiff's condition prior to the seizure.  And the Court does not know whether Individual Town Defendants themselves observed any abnormal behavior from Plaintiff prior to when they took him into custody.  Thus, relying solely on the facts in the Complaint, the Court has insufficient information to conclude there was probable cause based on the existence of the Removal Order.

The cases relied upon by Individual Town Defendants are distinguishable in this regard. Although they argue that "[c]ourts routinely dismiss Fourth Amendment unlawful seizure and false arrest claims against social workers and law enforcement personnel in the context of an MHL § 9.45 [p]ick [u]p [o]rder or § 9.41 seizure," (Town Defs.' Mem. 10–11), the three cases they cite were each decided on a developed factual record at the summary judgment stage (or on appeal from summary judgment), and each court's probable cause determination was based on the defendants' knowledge of particular facts, rather than the existence of a removal order itself. In *Vallen*, the court held that three social workers had probable cause to recommend and issue a removal order based on their knowledge of the plaintiff's (1) "history of mental illness and violence"; (2) his failure to comply with a previously issued order of conditions; (3) an anonymous phone call—which the plaintiff himself was suspected of placing—in which the caller stated that the plaintiff had a gun and would not return to the hospital voluntarily; and (4) "the accumulation of clinical evidence pointing to [the plaintiff's] psychiatric decompensation." *See* 2004 WL 555698, at *8.  In *Vallen*, then, the finding of probable cause was based on specific facts about the plaintiff's condition that preceded the issuance of the removal order.  It was not based on the removal order itself.  In *Hoffman*, the second case cited by Individual Town Defendants, the court held in relevant part that a county psychiatrist, a county commissioner of

social services, and a "[c]risis [i]ntervention [o]fficer" for the county's social services department had probable cause to recommend and issue a removal order based on the plaintiff's disturbing behavior, which included paranoid delusions, threats toward city officials, and his accumulation of a large collection of firearms. *See* 41 F. Supp. 2d at 209–13.[7]  As in *Vallen*, the court's probable cause determination was based on extensive facts about the plaintiff's condition that were known to the defendants prior to the issuance of the removal order, rather than the existence of the removal order itself. *See id.* at 209 ("Here, the facts as known by [the county psychiatrist] demonstrate that he had probable cause to issue a pick-up order."); *id.* at 212 ("Assuming a Constitutional harm and sufficient causal connection, [the commissioner of social services] reasonably concluded based upon the evidence then available that [the plaintiff] was dangerous and, thus, applied for an involuntary admission."); *id.* at 213 (concluding that the crisis intervention officer "had probable cause to believe that [the plaintiff] posed a substantial risk of harm to others sufficient to seek a pickup order" based upon information gathered during an interview with the plaintiff).  And in *Higgins v. City of Oneonta*, 617 N.Y.S. 2d 566 (App. Div. 1994), the court held that police officers' seizure of the plaintiff pursuant to MHL § 9.41 was privileged based on (1) their "knowledge of [the] plaintiff's longstanding hostility toward certain members of the [p]olice [d]epartment and [c]ity officials"; (2) "the obvious threatening nature" of phone calls the plaintiff had made to the police department; and (3) the fact that the plaintiff's psychiatrist had advised police to pick up the plaintiff for mental health treatment. *Id.* at 568–69.  Thus, the court's conclusion that the seizure was privileged did not rest solely on the

---

[7] The defendant who served as a crisis intervention officer for the county—Mark Hamilton—also served as a part-time deputy sheriff. *See Hoffman*, 41 F. Supp. 2d at 201.  The court did not decide whether this defendant was acting in his capacity as a crisis intervention officer or part-time deputy sheriff. *See id.* at 211, 213.

psychiatrist's recommendation to have the plaintiff removed from his home.  Moreover, the psychiatrist had shared with police the factual basis for his recommendation.  *See id.* at 568 (noting that the plaintiff's psychiatrist had "advised [the police chief] that [the] plaintiff ha[d] been more depressed and . . . said that he really felt a lot more like killing . . . people" (quotation marks omitted)).  In sum, the cases cited by Individual Town Defendants do not remotely suggest that the issuance of a removal order, without more, suffices to establish probable cause.

As noted, Individual Town Defendants argue that the officers had probable cause to seize Plaintiff based on various facts "in addition to" the Removal Order.  (Town Defs.' Mem. 7.)  For example, they reference "troubling telephone calls" Plaintiff made to the police regarding "welfare checks" for civilians and "estate planning" for his pet cat in the event he were found dead.  (*Id.*; *see also id.* at 12.)  They also argue that there was probable cause based on Altieri's report "that Plaintiff had explicitly threatened to commit suicide."  (*Id.* at 11; *see also id.* at 7.)  Because none of these facts appears in the Complaint, however, the Court will not consider them for purposes of resolving the instant Motion.  Contrary to Individual Town Defendants' assertion, the pleadings do not "clearly demonstrate" that Plaintiff was "mentally ill and posed a very serious threat to himself or others," (*id.* at 7), and these Defendants may not drag in extraneous facts to make it so.

Relying solely on the facts alleged in the Complaint, the Court cannot conclude as a matter of law that Individual Town Defendants had probable cause for the seizure.  Thus, Plaintiff has adequately alleged a constitutional violation.  At this stage of the case, it is not Plaintiff's obligation to establish that the officers *lacked* probable cause; rather, he "must merely allege sufficient facts to put [D]efendants on notice of [his] claims and the grounds upon which they rest."  *Bullard*, 240 F. Supp. 2d at 299.  Plaintiff has met that burden with respect to his

unlawful seizure claim.  Accordingly, the Court will not grant Town Defendants' Motion based on the argument that Individual Town Defendants had probable cause for the challenged seizure.

But the inquiry does not end there.  Having found that Plaintiff has adequately alleged a constitutional violation, the Court must consider whether Individual Town Defendants are entitled to qualified immunity.  "[T]he doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Heller*, 144 F. Supp. 3d at 624 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  To be entitled to qualified immunity, officers need only possess "arguable" probable cause to seize an individual, rather than actual probable cause.  *See Cerrone v. Brown*, 246 F.3d 194, 202 (2d Cir. 2001).  "Arguable probable cause exists when 'a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law.'"  *Id.* at 202–03 (quoting *Lee v. Sandberg*, 136 F.3d 94, 102 (2d Cir. 1997)).

Individual Town Defendants argue that they are entitled to qualified immunity because "it was not clearly established that the police could not rely on threats of suicide as reported by an identified treating mental health professional to supply probable cause for [the seizure]." (Town Defs.' Mem. 20; *see also id.* at 19 (suggesting that Plaintiff cannot show "that no reasonable officer could believe . . . that a suspected mentally ill individual threaten[ing] suicide was sufficient to constitute probable cause").)  There was arguable probable cause for the seizure, they argue, based on Plaintiff's "bizarre telephone calls" to the police department and "Altieri's report that Plaintiff had indicated that he was going to kill himself."  (*Id.* at 20.)  As

already noted, neither of these facts is in the Complaint, and the Court may not consider either for purposes of resolving this Motion.

"[T]o determine whether a mental-health seizure is justified by arguable probable cause, a court must review the *specific observations and information available to the officers at the time of a seizure*." *Myers*, 819 F.3d at 633 (emphasis added).  For the same reasons already discussed with respect to *actual* probable cause, the Court lacks sufficient information to determine whether the officers had *arguable* probable cause for the seizure.  This should come as no surprise, for "the evidence supporting a finding of qualified immunity is normally adduced during the discovery process and at trial, [and thus,] the defense of qualified immunity [usually] cannot support the grant of a [Rule 12(b)(b)] motion for failure to state a claim." *Kanciper v. Lato*, 989 F. Supp. 2d 216, 231 (E.D.N.Y. 2013) (second alteration in original) (citation omitted) (observing that a defendant "asserting a qualified immunity defense at the 12(b)(6) stage . . . faces a formidable hurdle" (citation omitted)).  In this situation, it is appropriate to deny the motion and revisit qualified immunity once the Court has a more developed factual record to consider.  *See, e.g.*, *id.* at 232–33 (denying motions to dismiss on the basis of qualified immunity where "there [was] simply insufficient information at th[at] early stage to determine whether the [defendant's] conduct . . . [was] protected by qualified immunity" (citation omitted)); *Anilao v. Spota*, 774 F. Supp. 2d 457, 493 (E.D.N.Y. 2011) ("[W]hile the [c]ourt . . . recognizes that the qualified immunity issue should be decided at the earliest juncture where possible, the [c]ounty defendants' motion to dismiss plaintiffs' claims on the basis of qualified immunity is denied, given the allegations in the complaint."); *Selinger v. City of New York*, No. 08-CV-2096, 2009 WL 1883782, at *6 (S.D.N.Y. June 30, 2009) (denying motion to dismiss in part where there was insufficient information to determine whether the conduct of individual defendants was protected

by qualified immunity); *Bostic v. City of Binghamton*, No. 06-CV-540, 2006 WL 2927145, at *4 (N.D.N.Y. Oct. 11, 2006) ("While the facts that may be established through discovery might lead to the conclusion that the individual defendants possessed actual or arguable probable cause to arrest [the] [p]laintiff and commence his prosecution on certain crimes, that determination will have to await a summary judgment motion or trial.").  Thus, the Court will not grant Town Defendants' Motion based on qualified immunity.

As noted, Individual Town Defendants separately argue that they acted lawfully pursuant to MHL § 9.45.  (*See* Town Defs.' Mem. 4–7.)  This section authorizes a "director of community services" to issue a removal order such as the one in this case, and further provides that "[i]t shall be the duty of . . . police officers . . . to assist representatives of [a] director [of community services] to take into custody and transport" a person who "has a mental illness for which immediate care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others."  N.Y. Mental Hyg. Law § 9.45.  Though Individual Town Defendants do not explicitly claim that a removal order issued under § 9.45 is the functional equivalent of a search warrant issued by a "neutral and detached magistrate," *Johnson v. United States*, 333 U.S. 10, 14 (1948), that essentially is their argument, (*see* Town Defs.' Mem. 5–6). They argue, for example, that the Removal Order issued by Miller "served as the lawful and valid basis for their seizure of Plaintiff when assisting in transporting him for further mental evaluation."  (*Id.* at 6.)  They also argue that "the ultimate validity or invalidity of the [Removal Order] is irrelevant," because the "ultimate inquiry is whether the [officers] acted objectively reasonable [sic]" in relying on the Removal Order.  (*Id.*)  In what is a tell-tale giveaway as to the nature of their argument, Individual Town Defendants then cite *United States v. Leon*, 468 U.S. 897 (1984), in which the Supreme Court held that the exclusion of evidence is not warranted

when officers act "in objectively reasonable reliance" on a search warrant—even if the warrant itself is subsequently invalidated, *id.* at 922; *see also United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011) ("In *Leon*, the Supreme Court strongly signaled that most searches conducted pursuant to a warrant would likely fall within its protection.").  "[W]hen an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," the Court in *Leon* explained, "there is no police illegality and thus nothing to deter [by excluding evidence]."  468 U.S. at 920–21.  Although *Leon* arose in the suppression context, its principles also "appl[y] in civil cases . . . brought pursuant to § 1983, in which a plaintiff seeks to challenge a warranted search as unlawful."  *Calderon v. City of New York*, No. 14-CV-1082, 2015 WL 2079405, at *5 (S.D.N.Y. May 4, 2015).  Thus, it is well-established that a "police officer who relies in good faith on a warrant issued by a neutral and detached magistrate upon a finding of probable cause is presumptively shielded by qualified immunity."  *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 286 (S.D.N.Y. 2015) (quoting *Simms v. Village of Albion*, 115 F.3d 1098, 1106 (2d Cir. 1997)).  Having cited *Leon*, Individual Town Defendants even refer to the Removal Order as a "warrant," arguing that the officers had no basis to question its validity or the basis on which it was issued.  (*See* Town Defs.' Mem. 6.)

As an initial matter, the Court is skeptical that a mental-health removal order issued under MHL § 9.45 is entitled to the same deference as a search warrant issued by a neutral and detached magistrate.  It is true that one court in the Second Circuit has suggested in dicta that a removal order is "[a]kin to the issuance of an arrest warrant," *Hoffman*, 41 F. Supp. 2d at 209.  But for reasons already discussed *supra*, neither *Hoffman* nor *Vallen* nor *Higgins* had reason to consider whether good-faith reliance on a removal order, without other supporting indicia of probable cause known to the officers, provides qualified immunity.  These cases suggest that the

relevant inquiry is the one already undertaken above, namely whether the officers had probable cause—apart from (or in addition to) a removal order—for effectuating the challenged seizure.[8]

But the Court need not resolve this issue, for even if it treats the Removal Order as a search warrant, dismissal of the unlawful seizure claim is still not justified at this stage. Although a police officer who relies in good faith on a search warrant is "presumptively shielded by qualified immunity," *Green*, 96 F. Supp. 3d at 286 (citation omitted), "[t]o claim the benefits of the good faith exception, . . . the officer's reliance on the duly issued warrant must be objectively reasonable." *United States v. Raymonda*, 780 F.3d 105, 118 (2d Cir. 2015) (citation and quotation marks omitted).  Whether an officer's reliance is "objectively reasonable," however, depends in large part on what the officer knew about the basis for the authorized search.  Thus, the good faith exception is unavailable when, for example, "the issuing magistrate has been knowingly misled," or "where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable." *Id.*  In a typical search warrant case, the officers who have relied on a warrant are often the same ones who prepared the warrant application or otherwise took part in the investigation leading to the issuance of the warrant.  Thus, they are in a position to know whether the issuing magistrate was misled, or whether the warrant application was "so lacking in indicia of probable cause" as to render their reliance on the warrant unreasonable.  That is not the case here, where the Removal Order was brought to the police by a third party (Altieri) who had provided the relevant information to the issuing officer (Miller)

---

[8] To be sure, if the evidence adduced during discovery shows that Altieri communicated to the officers a message that these officers could have reasonably understood as Altieri's "expression of her professional judgment that [Plaintiff] should be seized for psychiatric evaluation because of danger of serious physical harm," then the officers will be "protected by qualified immunity." *Myers*, 819 F.3d at 634.  Although the contours of the Complaint arguably give rise to such an inference, the Court cannot conclusively say, based on the paucity of factual specifics in the Complaint, that this was the case.

herself.  As already discussed above, the Court knows very little, based on the limited information in the Complaint, about what Individual Town Defendants knew (or did not know) regarding the basis for the search.  Indeed, Individual Town Defendants acknowledge that "Plaintiff's Complaint is entirely devoid of any factual details or allegations concerning [Individual Town] Defendants['] knowledge and/or involvement as it relates to obtaining the allegedly improper warrant."  (Town Defs.' Mem. 6.)  Without this information, however, the Court may not determine whether the officers' reliance on the Removal Order was "objectively reasonable," and thus, whether they are entitled to qualified immunity on this basis.  Accordingly, the Court will not grant Town Defendants' Motion on this basis either.

Finally, Individual Town Defendants argue that they are protected from liability under MHL § 9.59, which provides that a police officer who transports a person to the hospital pursuant to the MHL "shall not be liable for damages for injuries . . . alleged to have occurred by reason of an act or omission unless it is established that such injuries . . . [were] caused by gross negligence."  N.Y. Mental Hyg. Law § 9.59.  "Immunity from a [§] 1983 claim, however, is a matter of federal law and cannot be immunized by state law."  *Anthony v. City of New York*, No. 00-CV-4688, 2001 WL 741743, at *6 n.9 (S.D.N.Y. July 2, 2001) (citation and quotation marks omitted).  The Court therefore declines to dismiss the unlawful seizure claim on this basis.

For the foregoing reasons, Town Defendants' Motion is denied as to Count Two.

### ii.  False Imprisonment (Count Three)

When confronted with a false imprisonment claim under § 1983, courts look to New York state law to determine the elements of this cause of action.  *See Tobias v. County of Putnam*, 191 F. Supp. 2d 364, 375 (S.D.N.Y. 2002); *see also Greenaway*, 97 F. Supp. 3d at 233 ("A Fourth Amendment claim of false imprisonment brought under 42 U.S.C. § 1983 is

'substantially the same' as a false imprisonment claim under New York State law." (citation omitted)).  Such a claim requires a showing that "(1) the defendant intended to confine the plaintiff; (2) the plaintiff did not consent to the confinement; (3) the plaintiff was aware that he was confined; and (4) the confinement was not otherwise privileged, such as confinement pursuant to a warrant or with probable cause or immunity protection."  *Tobias*, 97 F. Supp. 2d at 375 (citation omitted); *Greenaway*, 97 F. Supp. 3d at 233 (same).  Probable cause furnishes a complete defense to both Fourth Amendment and state law claims of false imprisonment. *Greenaway*, 97 F. Supp. 3d at 233.

Although Individual Town Defendants argue that the § 1983 (and state law) false imprisonment claim must be dismissed because the confinement was privileged, either because of the existence of probable cause or qualified immunity, (*see, e.g.*, Town Defs.' Mem. 8–9), the Court has determined that at this stage in the case, it cannot conclude as a matter of law that the confinement was privileged.  With this defense knocked out, Individual Town Defendants are left to contend that the Complaint "does not raise a well-pled allegation" of false imprisonment. (*Id.* at 24.)  The Court does not share that assessment.  Although the Complaint does not contain an abundance of factual detail, it adequately alleges facts showing (1) that Individual Town Defendants intended to confine Plaintiff, (*see* Compl. ¶¶ 52–59); (2) that Plaintiff did not consent to this confinement, (*see id.* ¶¶ 55, 59, 71); (3) that Plaintiff was aware of his confinement, (*id.* ¶¶ 59, 70); and, for reasons already discussed, (4) that this confinement was not otherwise privileged.  At this early stage of the case, Plaintiff has pled all he must to survive a motion to dismiss.  *See, e.g.*, *Mooney v. County of Monroe*, 508 F. Supp. 2d 222, 224–25 (W.D.N.Y. 2007) (holding that the plaintiff had adequately stated a false imprisonment claim under New York law where the complaint alleged that the defendant "caused him to be confined at the hospital . . .

against his will and in contravention of his repeated demands for release," and that "the confinement did not take place pursuant to [the MHL] and/or was undertaken in violation of that law, and [was] therefore not privileged").

Thus, Town Defendants' Motion is denied as to Count Three.

### iii.  Excessive Force (Count Four)

"Claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other seizure of a free citizen [are] analyzed under the Fourth Amendment and its reasonableness standard." *Usavage v. Port Auth. of N.Y. & N.J.*, 932 F. Supp. 2d 575, 591 (S.D.N.Y. 2013) (citation, alteration, and quotation marks omitted). "When determining whether police officers have employed excessive force in the arrest context, the Supreme Court has instructed that courts should examine whether the use of force is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to [the officers'] underlying intent or motivation.'" *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006) (alteration in original) (quoting *Graham*, 490 U.S. at 397). To evaluate the reasonableness of an officer's conduct, a court should "consider the facts and circumstances of each particular case, including the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest." *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999); *see also Kerman*, 261 F.3d at 239 (observing that the reasonableness determination "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake" (citation omitted)). "Generally, the force used by the [d]efendant must be more than de minimis in order for an excessive force claim to be actionable." *Musso v. City of New York*, No.

05-CV-2511, 2008 WL 3200208, at *4 (E.D.N.Y. July 24, 2008) (citation, alterations, and quotation marks omitted).

Where, as here, a defendant has moved to dismiss an excessive force claim at the pleadings stage, dismissal is only "appropriate if, accepting all of the allegations as true, it is clear that the force used by the officers was objectively reasonable under the circumstances." *Sanabria v. Tezlof*, No. 11-CV-6578, 2016 WL 4371750, at *4 (S.D.N.Y. Aug. 12, 2016) (quoting *Messina v. Mazzeo*, 854 F. Supp. 116, 128–29 (E.D.N.Y. 1994)).  Based on the limited information before the Court, it is not clear that forcing Plaintiff to the ground and sitting on his back to prevent him from standing, (*see* Compl. ¶¶ 54–55), was objectively reasonable under the circumstances, *see Sanabria*, 2016 WL 4371750, at *5 (denying motion to dismiss excessive force claim based on the plaintiff's allegation that officers had "step[ped] on [his] hands and back and str[uck] his knee once [he] was on the ground"); *Amid v. Lamb*, No. 14-CV-3151, 2016 WL 1070814, at *5 (E.D.N.Y. Mar. 15, 2016) (concluding that plaintiff adequately stated a claim for excessive force where she alleged that police officers "forcibly grabbed her and threw her to the ground, placing extreme pressure on her back and legs, and handcuffed her very tightly, causing pain and bruising" (record citation, brackets, and quotation marks omitted)); *cf. Harrison v. Inc. Village of Freeport*, — F. Supp. 3d —, 2020 WL 6382637, at *13–14 (E.D.N.Y. Oct. 30, 2020) (declining to dismiss excessive force claim on summary judgment where the plaintiff alleged that he was dragged from a vehicle and "thrown to the ground while an officer sat on his back and two officers twisted his body and pushed him into the ground"); *Smith v. City of New Haven*, 166 F. Supp. 2d 636, 643 (D. Conn. 2001) (concluding on summary judgment that there was a genuine issue of material fact as to whether officers used excessive force when they "forced [the plaintiff] to the ground, face down," and when one of the officers then "sat on his

back"). To determine whether Individual Town Defendants' actions were objectively reasonable, the Court needs to learn more about the "facts and circumstances confronting [the officers]," *Jones*, 465 F.3d at 61, particularly "the threat of danger to the officer[s] and society, and whether [Plaintiff] [was] resisting or attempting to evade arrest," *Thomas*, 165 F.3d at 143, neither of which is spelled out in the Complaint.

Accordingly, Town Defendants' Motion is denied as to Count Four.

### b. Plaintiff's State-Law Claims

Because the federal claims against Individual Town Defendants survive the instant Motion, the Court may decide to exercise supplemental jurisdiction over the state law claims against these Defendants, provided they "derive from a common nucleus of operative fact[s]." *Masciotta*, 136 F. Supp. 3d at 547 (alteration in original) (citation omitted). Here, Plaintiff's state and federal claims do arise out of a common nucleus of operative facts, namely his seizure and subsequent transport to Orange Regional. The Court will therefore exercise jurisdiction over Plaintiff's state law claims against Individual Town Defendants. In addition to naming Individual Town Defendants in his state law claims, Plaintiff also names the Town itself. (*See* Compl. ¶¶ 108–25.) "[A] common nucleus of operative fact can exist 'even if the state law claim is asserted against a party different from the one named in the federal claim.'" *Bryant v. Steele*, 25 F. Supp. 3d 233, 245 (E.D.N.Y. 2014) (quoting *Briarpatch*, 373 F.3d at 308). Thus, the Court will also consider the state law claims as to the Town. *See id.*

### i. Trespass (Count Six)

"Under New York law, trespass is the intentional invasion of another's property." *Scribner v. Summers*, 84 F.3d 554, 557 (2d Cir. 1996). "The requisite elements for a claim of trespass are the intentional entry by defendants on to plaintiffs' land and the wrongful use

without justification or consent." *Matthews v. Malkus*, 377 F. Supp. 2d 350, 359 (S.D.N.Y. 2005) (discussing New York law); *see also N.Y. State Energy Research & Dev. Auth. v. Nuclear Fuel Servs., Inc.*, 561 F. Supp. 954, 974 (W.D.N.Y. 1983) ("A trespasser, to be such, need not intend harm to or unlawful interference with the other's property and may in good faith believe that he or she or it is in some way entitled to enter or remain upon the property.").

Town Defendants argue that the Court should dismiss the trespass claim because Plaintiff has leveled a "bare-bones allegation" against the officers. (Town Defs.' Mem. 23.) They also argue that the trespass claim is undermined by "Plaintiff's own admissions earlier in his Complaint . . . [that the officers] acted upon a [Removal] Order issued pursuant to MHL § 9.45." (*Id.*) The latter argument studiously ignores the nature of Plaintiff's actual argument. As the Court has established, the Removal Order may not immunize the officers' conduct unless their reliance on the Order was objectively reasonable—a determination the Court cannot yet make based on the facts before it. Because the Court lacks sufficient information to conclude that the officers' entry was privileged, or that their conduct was otherwise immunized, Plaintiff has adequately alleged facts showing that the officers intentionally entered and wrongfully used his property without justification or consent. The Complaint therefore states a claim for trespass. *See Green*, 96 F. Supp. 3d at 293 (holding that the plaintiff adequately stated a claim for trespass based on allegation that police officers knew they were in the wrong location but did not leave, thus indicating that the entry was no longer privileged); *Evans v. Solomon*, No. 06-CV-3284, 2011 WL 609806, at *5 n.1 (E.D.N.Y. Feb. 15, 2011) (stating that "New York cases support the proposition that a law enforcement officer's privilege remains limited to constitutional searches and seizures" (citation omitted)); *Dockery v. Tucker*, No. 97-CV-3584, 2008 WL 2673307, at *11 (E.D.N.Y. June 26, 2008) ("[U]nder New York law, an officer has a privilege to trespass

upon property, pursuant to an arrest warrant, if the entry comports with constitutional limitations."); *Voskerchian v. United States*, No. 98-CV-335, 1999 WL 66709, at *4 (W.D.N.Y. Feb. 10, 1999) ("[A] law enforcement officer's privilege remains limited to constitutional searches and seizures." (citing *1090 Jericho Corp. v. Elias*, 559 N.Y.S. 2d 358, 361 (App. Div. 1990); *People v. Johnson*, 488 N.E.2d 439, 450 (N.Y. 1985) (Titone, J., concurring))).

As noted, Plaintiff brings his trespass claim not only against Individual Town Defendants, but also against the Town itself, (*see* Compl. ¶¶ 108–12), presumably under a theory of respondeat superior, (*see* Pl.'s Mem. of Law in Opp'n to Town Defs.' Mot. ("Pl.'s Second Opp'n") 19–20 (Dkt. No. 43) (arguing that the officers "were acting within the scope of their employment by [the Town]")). "Unlike cases brought under § 1983, municipalities may be liable for the common law torts . . . committed by their employees under the doctrine of respondeat superior." *Melvin v. County of Westchester*, No. 14-CV-2995, 2019 WL 1227903, at *14 (S.D.N.Y. Mar. 15, 2019) (ellipsis in original) (quoting *L.B. v. Town of Chester*, 232 F. Supp. 2d 227, 239 (S.D.N.Y. 2002)); *see also Raysor v. Port Auth. of N.Y. & N.J.*, 768 F.2d 34, 38 (2d Cir. 1985) (dismissing § 1983 claims under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), but permitting state law claims based on respondeat superior to proceed); *Bektic-Marrero v. Goldberg*, 850 F. Supp. 2d 418, 434 (S.D.N.Y. 2012) (declining "to dismiss the pendent state law claims against [the employer-defendant] that depend on the doctrine of respondeat superior," even where the plaintiff's § 1983 claims against that defendant were dismissed). "Under New York law, a plaintiff must establish that the individual employee was acting 'in furtherance of the duties he owes to his employer and where the employer is, or could be, exercising some control, directly or indirectly, over the employee's activities.'" *Calderon v. City of New York*, No. 14-CV-1082, 2015 WL 6143711, at *3 (S.D.N.Y. Oct. 19, 2015) (quoting

*Perez v. City of New York*, No. 94-CV-2061, 1996 WL 103836, at *2 (S.D.N.Y. Mar. 8, 1996)).

Here, the facts alleged adequately plead vicarious liability. Plaintiff alleges that Individual Town

Defendants were acting within the scope of their employment at all relevant times, (*see* Compl.

¶¶ 28, 30, 32, 34), and the key action here—arresting a person who reportedly posed a threat to

himself or others—is one which his employer "clearly could exercise some control over,"

*Calderon*, 2015 WL 6143711, at *3. Thus, the trespass claim against the Town cannot be

dismissed. Accordingly, Town Defendants' Motion is denied with respect to Count Six.

### ii. Assault (Count Seven) and Battery (Count Eight)

"Assault and battery claims, when alleged against a police officer, are evaluated like

excessive force claims." *Pateman v. City of White Plains*, No. 17-CV-6156, 2020 WL 1497054,

at *23 (S.D.N.Y. Mar. 25, 2020) (quoting *Brown v. City of New York*, No. 11-CV-1068, 2013

WL 491926, at *10 (S.D.N.Y. Feb. 8, 2013)); *see also Posr v. Doherty*, 944 F.2d 91, 94–95 (2d

Cir. 1991) (observing that, "except for § 1983's requirement that the tort be committed under

color of state law," the "essential elements" of "§ 1983 use of excessive force and state law

assault and battery" are "substantively identical," and analyzing these claims as a whole);

*Humphrey v. Landers*, 344 F. App'x 686, 688 (2d Cir. 2009) (summary order) (same); *Harrison*,

2020 WL 6382637, at *14 ("Excessive force claims and state law assault and battery claims

brought against police officers are nearly identical."). "Thus, because Plaintiff's excessive force

claim[] against [Individual Town Defendants] remain[s], so too do[es] Plaintiff's state claims for

assault and battery against these Defendants, and against [the Town] under the theory of

respondeat superior." *Pateman*, 2020 WL 1497054, at *24; *see also Harrison*, 2020 WL

6382637, at *14 (reasoning that because "the [c]ourt is allowing one of the [plaintiff's] excessive

force claims to proceed[,] [it] thus rules the same way with regard to [the state law] assault and

battery [claims]"); *Williams v. City of White Plains*, 718 F. Supp. 2d 374, 381 (S.D.N.Y. 2010)

("The remaining state law claim of assault and battery against the City of White Plains is alive

due to the potential for vicarious liability for actions of its police officers as its employees.").

Town Defendants' Motion is therefore denied with respect to Counts Seven and Eight.

### iii.  False Imprisonment (Count Nine)

As noted, a false imprisonment claim is "substantially the same" under New York law as

it is under § 1983.  *Greenaway*, 97 F. Supp. 3d at 233 (analyzing § 1983 and state law false

imprisonment claims together); *see also Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir.

2007) ("A [§] 1983 claim for false arrest is substantially the same as a claim for false arrest

under New York law.")[9]  Because the Court has already found that Plaintiff's § 1983 false

imprisonment claim survives the instant Motion, the corresponding state law claim also survives.

*See Calderon v. City of New York*, 138 F. Supp. 3d 593, 609–11 (S.D.N.Y. 2015) (denying

motion to dismiss false arrest claims under § 1983 and New York state law where the plaintiff

"adequately [pled] false arrest"), *modified on other grounds on partial reconsideration*, 2015

WL 6143711 (S.D.N.Y. Oct. 19, 2015); *see also Harley v. City of New York*, No. 14-CV-5452,

2016 WL 552477, at *6 (E.D.N.Y. Feb. 10, 2016) (same).  And "[b]ecause the Court finds that it

cannot, at this stage of the proceedings, . . . dismiss the false [imprisonment] claims against the

Individual [Town] Defendants, *see supra*, the Court likewise cannot dismiss the New York

[s]tate law false [imprisonment] claim asserted against the [Town], and that aspect of [Town]

Defendants' [M]otion [T]o [D]ismiss is denied."  *Harley*, 2016 WL 552477, at *6.  Moreover, at

---

[9] "Under New York law, false arrest and false imprisonment are one and the same, and
the elements for both are the same as for a false arrest claim under § 1983."  *Hershey v.
Goldstein*, 938 F. Supp. 2d 491, 515 (S.D.N.Y. 2013); *see also Posr*, 944 F.2d at 96 ("In New
York, the tort of false arrest is synonymous with that of false imprisonment.").

this stage of the case, the Court cannot conclude that the officers are immune pursuant to MHL § 9.59, as Town Defendants argue.  (*See* Town Defs.' Mem. 24–25.)  There are insufficient facts to determine as a matter of law that Individual Town Defendants did not act with "gross negligence," meaning "conduct that evinces a 'reckless disregard' for the plaintiff's rights or 'intentional wrongdoing.'"  *Thomas v. City of New York*, No. 09-CV-3162, 2010 WL 5490900, at *10 (S.D.N.Y. Dec. 22, 2010) (quoting *Woody v. Astoria Gen. Hosp., Inc.*, 694 N.Y.S. 2d 41, 42 (App. Div. 1991)).

Accordingly, Town Defendants' Motion is denied with respect to Count Nine.

## III.  Conclusion

For the foregoing reasons, Access Defendants' Motion is GRANTED, and Town Defendants' Motion is DENIED.

The Clerk of Court is respectfully directed to terminate the pending Motions, (Dkt. Nos. 37, 39).

SO ORDERED.

Dated:    March 23, 2021
          White Plains, New York

_____
          KENNETH M. KARAS
          United States District Judge